IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| RENT-A-CENTER, INC & SUBSIDIARIES, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 111031D |
| v. | ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) ) | **FINAL DECISION** |

The court entered its Decision in the above-entitled matter on April 23, 2014. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiffs appeal Defendant's Notice of Deficiency Assessment, dated June 29, 2011, concluding that for tax year 2003: (1) Plaintiffs' wholly owned subsidiary, ColorTyme, Inc. (ColorTyme), had nexus with Oregon; (2) ColorTyme and Legacy Insurance Co., Ltd. (Legacy) are part of the unitary group, Rent-A-Center, Inc. (RAC), and must be included in RAC's 2003 Oregon Corporation Excise Tax Return; and (3) the statute of limitations for the 2003 tax year had not expired at the time Defendant issued its Notice of Deficiency to Plaintiffs, allowing Defendant to include ColorTyme's income and factors (sales, property and payroll) in the income and factors of the RAC unitary group.[1]

/ / /

---

[1] By the Complaint, filed on September 26, 2011, Plaintiffs appealed tax years 2002 and 2003. (Ptfs' Compl at 2.) Plaintiff's attorney, Hollis L. Hyans, stated at trial that "[a]ll 2002 has been resolved"; therefore, tax year 2002 is no longer at issue in this appeal.

A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on August 12, 2013. Carol Vogt Lavine, Attorney at Law, and Hollis L. Hyans, Attorney at Law, appeared on behalf of Plaintiffs. Hugh L. Tollack II (Tollack), Certified Public Accountant, Director of Tax Audits, Research and Planning, Rent-A-Center, Inc., and Professor Richard Pomp (Pomp), Alva P. Loiselle Professor of Law, University of Connecticut Law School, and adjunct Professor of Law, LL.M. Program in Taxation, New York University Law School, testified on behalf of Plaintiffs.

The parties' Stipulated Exhibits 1 through 32, Plaintiffs' Exhibits 1 through 8, Defendant's Exhibits A through RR, and Defendant's Rebuttal Evidence WW and XX were received without objection.

## I. STATEMENT OF FACTS

Tollack briefly reviewed the RAC organizational structure and recited RAC's corporate history, testifying that in 1995, RAC, known as Renter's Choice, "went public" and by the end of 1998, RAC grew from 300 stores to 2,100 stores. (*See* Ptfs' Ex 1.) Currently RAC is "the largest rent-to-own operator in North America[.]" (Def's Ex QQ at 63.) Tollack testified that RAC acquired ColorTyme in 1996. He testified that ColorTyme stores were "rebranded as Renter's Choice" and the entity focused its business "on its franchise operations and from that point forward did not own or operate any stores." (*See* Stip Ex 25 at 7.) ColorTyme's Notes to Consolidated Financial Statements for years ending December 31, 2003 and 2002 stated:

> "The Company's primary source of revenue is the sale of rental equipment to its franchisees, who, in turn, offer the equipment to the general public for rent or purchase under a rental-purchase program. The balance of the Company's revenue is generated from royalties, based on the franchisee's gross revenues, and from the franchise fees, which consist of fees earned from the sale of franchises. At December 31, 2003, there were 329 franchised ColorTyme rental centers operating in 40 states. All but 12 of the ColorTyme rental centers use ColorTyme's tradenames, service marks, trademarks, logos, emblems and indicia of origin. These 12 stores use the Rent-A-Center name."

(*Id*. (emphasis omitted).) There were seven ColorTyme stores operating in Oregon in 2003.

(Stip Ex 5 at 1.)  Tollack testified that the RAC blue, yellow, and red branded stores "[had a] different color scheme[]" from the ColorTyme light green and earth tone branded stores.

A.    *Nexus*

Tollack concluded that ColorTyme's "activities in Oregon * * * do not create nexus and are insufficient to allow Oregon jurisdiction to tax Colortyme." [2]  (Stip Ex 5 at 1.)  Tollack testified that ColorTyme did not "own or rent any real or tangible personal property in Oregon in 2003[.]" (*See id*.)  He testified that "ColorTyme received orders from its franchisees [for rental merchandise]" at its headquarters in Texas and "the vendors drop shipped the [ordered merchandise] directly to the franchise locations." (*See id*. at 2.)  Tollack testified that two ColorTyme employees visited Oregon "for portions of four days each [in 2003.]" (*See id*. at 1 (stating "portions of 8 days in 2003"); *see also* Def's Ex BB at 1, 9 (expense reports for Curt Scollard and Steven Arendt).)  Tollack testified that ColorTyme's franchisees used point-of-sale software from the same vendor, High Touch, which supplied RAC's software.  (*See* Stip Ex 5 at 1.)  He differentiated the two systems, stating that the type of software used by ColorTyme was "very simple and much less expensive" than RAC's customized version; according to Tollock, ColorTyme's software was "off the shelf just like you would buy QuickBooks off the shelf." (*See id*.)  Tollack testified that RAC contracted with High Touch to make "millions and millions of dollars of modifications and customizations to [the software] * * *.  Nobody else anywhere in the world [] use[d] the same software that we use[d]." (*See* Stip Ex 28 at 1.)  Tollack stated that the standard franchise agreements "require any disputes to be resolved under Texas law." (Stip Ex 5 at 2.)

/ / /

---

[2] ColorTyme filed a separate Oregon corporate excise tax return for tax year 2003.  (Stip Ex 3.)

B.      *Unitary*

Tollack noted that ColorTyme and Legacy "did not engage in business activities that constitute a unitary business with their affiliates in the federal consolidated [RAC] group during [] tax year[] * * * 2003." (Stip Ex 5 at 2.)  At trial, Tollack testified that even though Legacy and RAC shared a few directors and board members, those individuals did not participate in the management of Legacy operations.  (*See id*.)  He testified that all day-to-day operations were run by "AON Bermuda, which was engaged separately[,]" and did not include "any officer, director or employee of Rent-A-Center * * * [.]"  (*See id*.)  Defendant noted that the RAC President Mitchell E. Fadel was formerly President and Chief Operating Officer of ColorTyme, Inc. (Def's Ex PP at 1; Stip Ex 32.)  Defendant noted that at the time Steven Arendt was ColorTyme's Chief Executive Officer he was granted 18,750 options to purchase RAC's common stock over a four year vesting period and the options expired 10 years from the date of grant.  (Def's Ex WW at 1.)

Tollack testified that ColorTyme franchisees were competitors with RAC and therefore, RAC did not have "access to information about the performance of ColorTyme's franchisees' stores[.]"  (*See* Stip Ex 5 at 2.)  Without detailed financial information, RAC's "involvement with the day-to day operations of Colortyme's business planning * * * [was limited to] oversight as an investor[.]"  (*See id*.)  Tollack testified that the RAC 10-K Annual Report's use of the pronouns, "we," "us" and "our," was overly inclusive when describing the "management team," stating that the RAC "management team" did not "direct[] and coordinate[] purchasing, financial planning and controls, employee training, [or] personnel matters" for ColorTyme.  (*See* Def's Ex QQ at 49.)

/ / /

Tollack described the responsibilities of ColorTyme's 18 employees, concluding there are "[n]o centralized administrative services or functions resulting in economies of scale[.]" (Stip Ex 5 at 2.) Tollack testified that RAC's management company, Rent-A-Center Texas, LP, did not "perform any services for ColorTyme[,] [nor] were there any service agreements, any cost-sharing agreements, [or] similar agreements between Colortyme and any other member of the [RAC] group[.]" Tollack testified that there were not "any intercompany expenses or revenues between Colortyme and [RAC]." He testified that RAC processed ColorTyme payroll with its "own workforce of more than 15,000" employees and prepared ColorTyme "tax compliance returns but ColorTyme prepared its own sales and use tax returns." Tollack testified that ColorTyme employees were allowed "to participate in benefit plans administered by RAC" but ColorTyme had its own employee manual and policies. He also testified that ColorTyme maintained its own outside legal counsel, rented its own office space near to RAC's offices, and obtained separate insurance coverage. (*See* Stip Exs 5 at 2, 17-18 (ColorTyme, Inc. Policy Manual and RAC Coworker Manual).) Defendant asked Tollack about the reported litigation filed against RAC and ColorTyme in Wisconsin as reported by Thomas W. Hughes of Winstead Sechrest & Minick P.C., corporate counsel to RAC. (Def's Exs C at 1, 8, D at 7, V at 39; *see also* Stip Exs 10 at 4, 11 at 1 (litigation at time of merger).) Tollack testified that ColorTyme has its own "computer network and service provider and phone system."

Tollack testified that "there were no intercompany purchases or sales of services or goods between [RAC and Colortyme]. There was no sharing of employees. They were totally self-sufficient * * *." (*See* Stip Ex 5 at 3.) The parties discussed ColorTyme's webpage, titled "Why Choose ColorTyme?," which states "[p]urchasing power of over 2450 stores [2100 RAC stores and 350 ColorTyme stores] providing quality brand name products and services." (Stip Ex 31 at

1.)  Tollack testified that the purchasing power reference to RAC was removed from the website because "it was not [accurate]."  Defendant stated that as of 2008, Colortyme was still advertising the buying power resulting from the RAC consolidated group; Defendant offered Exhibit XX, titled "Why ColorTyme," dated March 25, 2008, stating:

> "2.  Buying Power:  ColorTyme, Inc.'s purchasing power based on over 3000 stores, negotiations and product replacement for top brand name products for ColorTyme Franchisees is among the best in the country."

Tollack testified that all members of the RAC group bank with the same banking institution, allowing a daily "automated cash sweep[.]"  He testified that the ColorTyme cash swept by RAC is recorded as a non-interest bearing "reduction of [Colortyme] stockholder's equity" that is due on demand.  (*See* Stip Ex 25 at 3, 9.)

Tollack testified that ColorTyme provides financing to its franchisees.  (*See* Stip Exs 14-16.)  RAC was a party to the financing agreement, stating "RAC hereby guaranties the full and prompt payment and performance of all debts, liabilities and obligations of ColorTyme to TFC [Textron Financial Corporation] arising out of or in any way related to this Agreement * * *."  (Stip Ex 14 at 10; Def's Exs A, B, C, D at 15, K, L, M, N, V at 38, 73.)  Tollack testified that RAC was a second guarantor, but that "it was never needed" for RAC to be called upon to make good.

C.    *Legacy Insurance Co., Ltd (Legacy)*

Tollack testified that Legacy, a Bermuda company, was formed in late 2002 to write "insurance policies to cover the operational risks of [RAC] and its other subsidiaries * * *."  (*See* Ptfs' Ex 2 at 1; Stip Ex 5 at 2; Stip Ex 26.)  Tollack testified that, in 2003, "Legacy did [not] write insurance premiums for other companies[.]"  (*See id*.)  Legacy was registered as an "Insurer under the terms of the Insurance Act 1978" and Legacy "exercise[d] the 953(d) election under the United States Internal Revenue Code 1986 as amended commencing with effect from

the 2002 tax year," electing to file as a member of the RAC consolidated federal income tax return. (Jt Part Stip Facts at 11, ¶ 64-65; Def's Ex HH.) Legacy entered into a management agreement with Aon Insurance Managers (Bermuda), Ltd. to manage the operations and handle workers' compensation, automobile liability and general/products liability insurance for RAC. (Def's Ex HH at 4; Stip Ex 5 at 2.) RAC "monitored self insurance limits." (*See* Stip Ex 29 at 28; Def's Exs FF-GG .) Defendant noted that in late December 2002, Legacy designated "three (3) groups of signatories," requiring two individuals (each from a different group) to approve disbursements less than $20,000 and another combination of two individuals (each from a different group) to approve disbursements more than $20,000. (Def's Ex KK at 10.) Tollack testified that RAC prepared Legacy's tax returns. Defendant submitted a document, signed by Plaintiff, stating that RAC "guarantee[d] to [Legacy] the payment in full of the Liabilities of Legacy Insurance Co., Ltd. And further to indemnify and hold harmless Legacy Insurance Co., Ltd. from the Liabilities up to the maximum dollar amount [of "$25,000,000]." (Def's Ex MM at 1.) On redirect, Tollack testified that RAC has initiated litigation with the IRS disputing "whether [the document] is or is not a valid guarantee[.]" The parties stipulated that "Legacy did not do business in Oregon, had no employees or tangible property in Oregon, and was not itself subject to Oregon corporation excise tax during [2003]." (Jt Part Stip Facts at 11, ¶ 66.)

D.    *Combined Reporting*

Pomp stated in his Expert Opinion of Professor Richard D. Pomp (report) that he was "asked to discuss from a state tax policy perspective the rationale of a combined report, how that concept developed, how it should be interpreted, and whether it is justified under the facts of this case[]" for Oregon to include ColorTyme's net income and factors in RAC's 2003 Oregon Corporation Excise Tax Return. (Ptf's Ex 8 at 2.) At trial, Pomp briefly discussed the "three

primary methodologies" (separate accounting, formulary apportionment and combined reporting) used by states to tax interstate corporations. (*See id*. at 5-10.) In his report, Pomp stated that,

> "Oregon cannot automatically apply its apportionment formula to all of the income of a corporation. * * * If a corporation is carrying on a 'unitary business' within and without Oregon, the State has the necessary nexus with the out-of-state activities to allow it to apportion a share of all of the corporation's unitary income."

(*Id*. at 7.) Pomp concluded that "[f]or RAC to be required by the State to file a combined report with CT [ColorTyme], the two corporations must be in a unitary business. That relationship can be evidenced by strong centralized management, economies of scale, functional integration, flows of value, synergies, a sharing of expertise, and interdependencies." (Ptf's Ex 8 at 10.)

Pomp testified that "a [non-operational] feature of every parent-subsidiary relationship can[not] be a unitary feature." (*See id*.) Pomp identified the following as non-operational factors: payroll processing, accounting, legal, finance, tax preparation, human resources, information technology, SEC (Security Exchange Commission) reporting, and shared directors. (*Id*. at 11.) Pomp concluded that "[f]rom a tax policy perspective, the focus of a unitary business analysis should be on reality and not on hypotheticals." (*Id*. at 12.)

Pomp testified that after applying his principles focusing on reality and significant factors, he determined that RAC and ColorTyme were not "allies in the sense that normally we think of members of a unitary business to be, [] they [were not] acting for the betterment of the whole [RAC Enterprise]." (*See id*. at 13.) Pomp's testimony compared and contrasted the business operation of RAC and ColorTyme and he concluded that RAC and ColorTyme were competitors. (*See id*. at 13-15.) Defendant engaged Pomp in a discussion of RAC "right of first refusal" when a ColorTyme franchisee decided to sell a rent-to-own store. Pomp testified that he

gave little significance to that "right" because RAC was the "largest player in the rent-to-own business" and if a franchisee planned to sell, it was likely that RAC would be a likely potential buyer. Pomp concluded that t]he RAC cash management system, or daily cash sweep, was "more akin to a dividend and a contribution to capital," and RAC's payroll processing for ColorTyme's 18 employees was a *de minimis* marginal cost for RAC, which was performing the same service for its 15,000 employees. (*See id*. at 15-17.) Pomp testified that "RAC [was] not selling inventory to either ColorTyme or the franchisees of ColorTyme." (*See id*. at 17.) He stated that in his report that "[n]either CT nor its franchisees received a preferred price on their purchases because of RAC." (Ptf's Ex 8 at 17.) Defendant disputed that conclusion, offering documents describing the benefits of a Colortyme franchise that included "[p]urchasing power" based on over 2,450 stores as of 2003 and 3,000 stores as of 2008. (Stip Ex 31; Def's Ex XX.) Pomp testified that even though ColorTyme (among other RAC subsidiaries) guaranteed loans obtained by RAC, that fact would be insufficient to create a "unitary factor[] to make out a case of combined reporting * * *." (*See* Ptfs' Ex 8 at 19.) Pomp testified that "RAC was a secondary guarant[or] of ColorTyme's financing of its franchisees." (*See id*. at 19-20.) In his report, he stated that

> "[a] franchisee that availed itself of the financing arranged by [ColorTyme] paid a fee to [ColorTyme] for its guarantee. [ColorTyme] did not share this fee with RAC, which also received nothing for its role as a secondary guarantor from a franchisee-borrower. * * * * * Presumably the reason that RAC received no fee was because the benefit of its secondary guarantee was insignificant, as evidenced by the fact that it never had to make a payment because [ColorTyme] never defaulted."

(*Id*. at 20.)

In sum, Pomp concluded that,

> "RAC provided a number of non-operational services to" [ColorTyme.] But these were no different from the type of services that most Parents provide to their

subsidiaries. Any factor that describes most Parent-subsidiary relationship cannot be a unitary factor or else most Parents and their subsidiaries would be entitled or required to file a combined report."

(*Id*. at 20-21.)

E.    *Statute of Limitation*

Plaintiff alleged that the "statute of limitations for the assessment of a deficiency based upon the adjustments proposed has expired." (Stip Ex 5 at 3.) Plaintiff stated:

> "RAC and Colortyme filed separate returns for 2002 and 2003 on or before the extended due date each year. RAC and Colortyme have been examined by the Internal Revenue Service ("IRS"). RAC has agreed to certain adjustments made by the IRS during 2002 and 2003 and has reported these adjustments to Oregon within the time prescribed. The IRS did not make any adjustments to the taxable income of Colortyme. The adjustments proposed by the auditor have nothing to do with the IRS adjustments and therefore the proposed deficiency is barred by the statute of limitations."

(*Id*.) "For the tax year ending December 31, 2003, ColorTyme timely filed a separate Oregon corporation excise tax return reporting no liability for tax." (Jt Part Stip Facts at 3, ¶ 7.) Tollack acknowledged that RAC and its subsidiaries "extended the time to assess" federal income taxes for tax year 2003 during an audit by the Internal Revenue Service. (Def's Ex RR; Stip Ex 2.)

> "RAC agreed to certain IRS adjustments to the computation of the Affiliated Group's federal taxable income and provided notice of those adjustments to the Department on January 5, 2009. The IRS adjusted the separate federal taxable income of the Other Affiliated Group Members, including RAC East, but not the separate federal taxable income of ColorTyme."

(Jt Part Stip Facts at 3, ¶ 9.)

## II. ANALYSIS

The parties agree that two issues are before the court: unitary group of corporations and nexus. Even though the statute of limitations issue was raised during trial, Plaintiffs stated in its Opening Brief that:

/ / /

> "[Plaintiffs] are not maintaining the position that [Defendant] failed to
> issue a timely notice of deficiency within the Oregon statute of limitations."

(Ptfs' Opening Br at 1, n 1.)

A.      *Unitary Group – Applicable Law*

Oregon imposes a tax on the taxable income of every corporation that derives income from sources in Oregon, including "income from tangible or intangible property located or having a situs in this state and income from any activities carried on in this state[.]" ORS 318.020(2). [3] ORS 317.705(2) defines a "Unitary group," as "a corporation or group of corporations engaged in business activities that constitute a single trade or business." The parties agree that the applicable law for determining whether ColorTyme is a member of Plaintiffs' unitary group is ORS 317.705(3)(a) which states in pertinent part:

> " 'Single trade or business' means a business enterprise in which there exists directly or indirectly between the members or parts of the enterprise a sharing or exchange of value as demonstrated by:
>
> "(A) Centralized management or a common executive force;
>
> "(B) Centralized administrative services or functions resulting in economies of scale; and
>
> "(C) Flow of goods, capital resources or services demonstrating functional integration."

ORS 317.705(3)(b) provides that a " '[s]ingle trade or business' may include, but is not limited to, a business enterprise the activities of which:  (A) [a]re in the same general line of business (such as manufacturing, wholesaling or retailing)[.]" ORS 317.705(3)(a) lists three different factors that must be present. Because those three factors are joined by the word "and," all three factors must be present for an entity to be part of a unitary group. *See Preble v. Dept. of Rev.* (*Preble*), 331 Or 320, 324-25, 14 P3d 613 (2000) (holding that ORS 305.265(2) listed "three

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2001.

different requirements * * * [that] are connected by the word 'and,' which indicates that they [the three different requirements] are not alternatives."). Consistent with the statutory language of ORS 317.705(3)(a), Oregon Administrative Rule (OAR) 150-317.705(3)(a)(2)[4] provides that: "[e]ach of the three criteria listed in ORS 317.705(3)(a)(A)-(C) must be present to meet the definition of 'single trade or business.' "

ORS 317.705(3)(a) was amended in 2007, replacing the words "single trade or business" with "unitary business" and the word "and" was replaced by "or" in the list of requirements that explain how the "sharing or exchange of value" was demonstrated. Or Laws 2007, ch 323, § 1. The amendment was to "apply to tax years beginning on or after January 1, 2007." *Id*. at § 3.

"Tax year" for income tax purposes is not defined in the Oregon Revised Statutes. ORS 314.011(2)(a) states: "any term has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required or the term is specifically defined in this chapter." The Internal Revenue Code (IRC) defines "taxable year" as "the taxpayer's annual accounting period if it is a calendar year or a fiscal year [.]" IRC § 441(b)(1).[5] Plaintiffs' accounting period ended December 31, 2003. The "tax year" at issue in this case is 2003. (*See* Jt Part Stip Facts at 2, ¶ b ("[t]he 'Year in Issue' means the tax year ending December 31, 2003.").) Defendant alleged that "ColorTyme still would be unitary with RAC under ORS 317.705(3)(a) even if the court were to find that fewer than three factors were present." (Def's Post-Trl Br at 2.) Defendant alleged that:

> "RAC filed its 2003 amended Oregon return in 2009. The department issued its Notice of Deficiency in 2010. In 2006, effective January 1, 2007

---

[4] The court's references to the Oregon Administrative Rules (OAR) are to 2003, unless stated otherwise.

[5] The court's references to the Internal Revenue Code are to the 1986 code with updates applicable to 2003.

(before the 2007 Legislature clarified ORS 317.705(3)(a) by changing 'and' to 'or'), the department amended OAR 150-317.705(3)(a) to provide: 'The presence of all of the factors described in ORS 317.705(3) will demonstrate that a single

trade or business exists, but the presence of one or two such factors may also demonstrate the flow of value requisite for a single trade or business.' "

(Def's Post-Trl Br at 24 (citations omitted).)

Plaintiffs alleged that "[i]n this case, the Legislature has specified that until

January 1, 2007 all three factors in the unitary test at ORS 317.705(3)(a) must be satisfied."

(Ptfs' Reply Br at 2.) Plaintiffs alleged that:

> "[RAC] and ColorTyme, Inc. [] were two separate and independent enterprises that did not operate a 'single' trade or business. ColorTyme operated autonomously and was no more than an investment to RAC.
>
> "* * * * *
>
> "The Tax Court [] has before it two conflicting interpretations of the same body of law. The Department contends that its retroactive administrative interpretation of the three-factor unitary test can trump a prospective-only effective date enacted by the Oregon Legislature."

(*Id.* at 1.)

To interpret a statute, the court's goal is to discern the legislative intent. *PGE v. Bureau of Labor and Industries* (*PGE*), 317 Or 606, 610, 859 P2d 1143 (1993); ORS 174.020. The court must examine the text and context of the statute, consider legislative history, and, if necessary, look to general maxims of statutory construction. *PGE*, 317 Or at 610-11; *State v. Gaines* (*Gaines*), 346 Or 160, 164-65, 171-72, 206 P3d 1042 (2009). A witness's testimony "when consistent with the enacting legislators' own acts and comments, can provide some insight into legislative intent." *State ex rel OHSU v. Hass*, 325 Or 492, 508, 942 P2d 261, 270 (1997). The court must proceed "from what the legislature has written, to what the legislature has considered, and finally, as a last resort, to what the court determines makes sense." *Young v. State*, 161 Or App 32, 37, 983 P2d 1044 (1999).

The 2007 amendments to ORS 317.705(3)(a) were introduced to the Oregon legislature as Senate Bill (SB) 178 and applied to "[t]ax years beginning on or after January 1, 2007[.]" (Introduced SB 178 at 2.) The bill proposed that the change to the statute would be applicable to "[a]ny tax year for which a return is subject to audit or adjustment by the Department of Revenue on or after the effective date of this 2007 Act." (*Id*.) During the Senate Committee on Finance and Revenue meeting on February 13, 2007, Senator Ryan Deckert questioned Elizabeth Harchenko (Director Harchenko), Director of the Oregon Department of Revenue, about the consequences of making the statutory change to ORS 317.705(3)(a) prospective only to tax years beginning on or after January 1, 2007. Audio Recording, Senate Committee on Finance and Revenue, SB 178, Feb 13, 2007, at 1:17:17 (statement of Senator Deckert, committee chair), https://olis.leg.state.or.us/liz/2007R1/Committees/SFR/2007-02-13-08-45/SB178/Details (accessed April 8, 2014). Director Harchenko responded, in part, that:

> "[F]or tax years for which returns have already been filed, we would be using the standard that is in the current statute and the rules that we have adopted pursuant to that statute. And the courts would use that statute and those rules when it was looking at older years. *And then from returns filed from the effective date of the [] new definition going forward, we would apply the new standard*."

*Id.* at 1:17:22 (statement of Director Harchenko) (emphasis added). Senator Gary George questioned Director Harchenko regarding what businesses thought of making the amendments prospective without a retroactive provision for filed returns that by statute were open for audit or adjustment. *Id.* at 1:24:43 (statement of Senator George, committee vice-chair). Director Harchenko responded, in part:

> "One of the things that they [] value very highly is predictability. * * * So when you make something prospective, and they know that is the rule under which we are going to apply going forward and we are not concerned about a different rule going backwards, there is a certain value that they place on that, absolutely."

*Id.* at 1:25:06 (statement of Director Harchenko).

Senate Bill 178 was subsequently amended to remove the retrospective application language, making the change prospective and giving taxpayers "predictability" that the 2007 amendments would not be applied to tax years prior to January 1, 2007. *See* Senate Amendments to SB 178 (deleting "[a]ny tax year for which a return is subject to audit or adjustment by the Department of Revenue on or after the effective date of this 2007 Act."). The Enrolled SB 178 maintained the prospective-only application. *See* Enrolled SB 178 at 2 ("The amendments to ORS 317.705 * * * by section[] 1 * * * of this 2007 Act appl[ies] to tax years beginning on or after January 1, 2007.").

Defendant's allegation that OAR 150-317.705(3)(a) (2007) applies to the 2003 tax year fails because of the clear legislative intent to the contrary. An agency rule "cannot amend, alter, enlarge upon, or limit statutory wording so that it has the effect of undermining the legislative intent." *Garrison v. Dept. of Rev.*, 345 Or 544, 548-49, 200 P3d 126 (2008) (citing *Miller v. Employment Division*, 290 Or 285, 289, 620 P2d 1377 (1980)). Defendant's administrative rule cannot "amend, alter, enlarge upon, or limit" the statutory wording of ORS 317.705(3)(a). Based on the legislative history, the intent was clear: the statutory change to ORS 317.705(3)(a) was to apply to tax years beginning on or after January 1, 2007, and could not be applied to filed returns for tax years prior to January 1, 2007, that were open for audit or adjustment. Because the tax year before the court is 2003, statutory amendments to ORS 317.705(3)(a) effective for tax years beginning on or after January 1, 2007, are not applicable.

Defendant alleged that its 2007 administrative rule "brought the department's construction of ORS 317.705(3)(a) into harmony with the tax court's application of ORS 317.705(3)(a) in *Maytag Corp. v. Dept. of Rev.[(Maytag)],* 12 OTR 502 (1993)." (Def's Post-Trl Br at 2-3.) Defendant alleged that:

"In *Maytag*, [the court] held that 'the Oregon statutes before and after *Container Corp.* intend to assert jurisdiction to the full extent allowed by the Due Process Clause,' finding that, during the first year ORS 317.705(3)(a) was in effect

(1986), two subsidiaries were unitary with the parent when there was centralized management and economies of scale but <u>not</u> functional integration.

"The *Maytag* court's construction of ORS 317.705(3)(a) is consistent with the use of 'and' in the context of ORS 317.705(3)(a)(A) to (C)."

(*Id.* at 25 (emphasis in original) (citations omitted).) In response, Plaintiff alleged that:

"[T]he court in *Maytag* discussed the three criteria adopted by the 1984 Legislature. However, rather than deciding the case based on the presence or absence of the three criteria, the court looked to whether the subsidiaries served an investment or operational function under *Allied-Signal v. Dir., Tax Div.*, [*Allied-Signal*] 504 U.S. 768, 112 S. Ct. 2251 (1992)[.] * * * Notably, the *Maytag* court focused on the portion of the *Allied-Signal* opinion that offered an additional basis for a unitary finding (other than the presence of the three statutory criteria)—that being whether the assets at issue served an operational or investment function. * * *.

"* * * [T]he *Maytag* court's unitary determination was based on the operational nature of the subsidiaries <u>despite</u> the absence of one of the three criteria, <u>not because</u> two of the three unitary criteria were present."

(Ptf's Reply Br at 6-7 (emphasis in original).)[6]

The court in *Maytag* based its decision on the U.S. Supreme Court's holding in *Allied Signal* that directed the unitary business inquiry focus "on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State." *Maytag*, 12 OTR at 507 (citing *Allied-Signal*, 504 US at 785). The court in *Maytag* found plaintiff's subsidiaries were unitary, stating:

"Here the focus is on whether the assets, Dixie-Narco and Toastmaster, serve an operational function rather than an investment function. Based upon the extent of the managerial control which plaintiff exercised over Dixie-Narco and Toastmaster, the court finds that they served an operational function. Plaintiff

---

[6] Plaintiffs noted the " 'operational nature' of a business relationship is no longer a separate test for a unitary business." (Ptf's Reply at 7, n 6 (citing *Meadwestvaco Corp. v. Ill. Dept of Revenue* (*Meadwestvaco*), 553 US 16, 29, 128 S Ct 1498, 170 L Ed 2d 404, (2008)).

does not treat Dixie-Narco or Toastmaster as investments. Rather, plaintiff controlled their operations in the same manner as its divisions."

12 OTR at 510.

The court's decision in *Maytag* was decided before the guidance provided by the Oregon Supreme Court in *Preble*, stating when three factors are connected by the word "and," it "indicates that they are not alternatives." *Preble*, 331 Or at 325. The court held that "[t]he text of the statute shows that such a reading [otherwise] would violate the legislative intent." *Id.* The legislative intent of the 2007 statutory amendment supports the court's conclusion that the inclusion of "and" in the statute requires that all three factors must be met for a business to be unitary and subsequent tax years would apply a new standard. Audio Recording, Senate Committee on Finance and Revenue, SB 178, Feb 13, 2007, at 1:17:17 (statement of Director Harchencko), https://olis.leg.state.or.us/liz/2007R1/Committees/SFR/2007-02-13-08-45/SB178/Details (accessed April 8, 2014); *see Preble*, 331 Or at 325.

In 2008, the U.S. Supreme Court stated in *Meadwestvaco*, 553 US at 29-30, that:

"References to 'operational function' in *Container Corp.* and *Allied-Signal* were not intended to modify the unitary business principle by adding a new ground for apportionment. * * * The conclusion that the asset served an operational function was merely instrumental to the constitutionally relevant conclusion that the asset was a unitary part of the business being conducted in the taxing State rather than a discrete asset to which the State had no claim.

Reliance on the court's analysis in *Maytag*, focusing on a separate operational function test in defining unitary business, ignores subsequent case law and most important ignores the three statutory factors of ORS 317.705(3)(a). Defendant's conclusion that "the presence of one or two such factors may also demonstrate the flow of value requisite for a single trade or business[]" is incorrect for the tax year before the court. (Def's Post-Trl Br at 24 (citations omitted).)

/ / /

B.    *Unitary Group - ColorTyme*

ColorTyme, a wholly owned subsidiary of Rent-A-Center, Inc., was acquired in 1996. (Jt Part Stip Facts at 5, ¶ 18.)  At the time of the acquisition, ColorTyme "had its own employees, corporate systems, and policies and performed its own business functions." (*Id*. at 5, ¶ 1.)  There was no evidence that ColorTyme substantially changed how it operated its business after the acquisition by RAC, Inc. other than to limit its activities to franchise operations.

The parties dispute whether RAC and ColorTyme were, under Oregon tax law, "engaged in business activities that constitute a single trade or business.' ORS 317.705(2).  The "sharing or exchange of value" either "directly or indirectly between the members or parts of the enterprise" is demonstrated by:

"(A) Centralized management or a common executive force;

"(B) Centralized administrative services or functions resulting in economies of scale; and

"(C) Flow of goods, capital resources or services demonstrating functional integration."

ORS 317.705(3)(a).  Those factors when taken together must demonstrate a sharing or exchange of value directly or indirectly among the members of the unitary group.

1.    *Centralized management or a common executive force.*

Looking first at centralized management or a common executive force, there is no dispute that two members of ColorTyme's board of directors were Plaintiffs' executive officers and neither individual performed services for Colortyme. (Def's Post-Trl Br at 3; Ptfs' Opening Br at 17.)  "RAC appointed the same people to serve as statutory officers required by state law for each of RAC's subsidiaries, including ColorTyme. (Jt Part Stip Facts at 8, ¶ 44.) ColorTyme's President and Chief Executive Officer "did not serve as a RAC officer[.]" (Def's Post-Trl Br at 4.)

FINAL DECISION  TC-MD 111031D                                                          18

There was no evidence that ColorTyme operates its franchise business different than it did before it was acquired by RAC. For tax year 2003, ColorTyme operated as an independent company. ColorTyme had its own full time management and daily operations were under ColorTyme's authority and control. There was no evidence of active daily management by RAC or that RAC was substantially involved in the actual operations of ColorTyme. There was no evidence of a transfer of personnel between RAC and its subsidiaries, specifically ColorTyme. There was no evidence that RAC offered centralized training or required ColorTyme to adopt its employee manuals and policies. (Ptfs' Opening Br at 16.) ColorTyme's operating results were not "considered for the profits used to determine compensation or bonuses for RAC's management team." (*Id*.)

Defendant alleged that because (1) ColorTyme's President and Chief Executive Officer received stock options from publically traded RAC, Inc., (2) ColorTyme's previous President and Chief Executive Officer was promoted to Plaintiffs' President, (3) Plaintiffs' board of directors discussed "growth strategy" noting "acquisition of existing rent-to-own stores, including ColorTyme franchise stores," and (4) "RAC's board closely monitored state and federal legislation affecting the rent-to-own industry," the statutory requirement of centralized management or common executive force was met. (Def's Post-Trl Br at 3-7.) The court does not agree with Defendant.

A sharing of corporate officers who did not direct or dictate ColorTyme's operations does not result in centralized management. The fact that the RAC board discussed a growth strategy that included the current operations of its wholly owned subsidiary (ColorTyme) is not indicative of centralized management but rather RAC's management of its investment. The stock options of a publicly traded entity (RAC) offered to ColorTyme's President was an incentive for that

individual to stay in his position as President of ColorTyme for a sufficient period of time (four years) to earn the right to exercise the stock options and add to his compensation; those stock options are not evidence of centralized management. There is no evidence that the advancement of the prior ColorTyme President to RAC President was attributable to a planned centralized management program but rather that individual's prior service to RAC before serving as ColorTyme's President.

Defendant emphasized that "ColorTyme was the franchisor of stores in the same line of business as RAC—rent-to-own stores, not burger chains or coffee shops." (Def's Post-Trl Br at 6.) Even though RAC and its subsidiaries shared the same line of business (rent-to-own furniture) with ColorTyme, ColorTyme had its own brand and its franchisees were often located in the same neighborhoods as RAC, making them direct competitors for the same rent-to-own market. ColorTyme's primary business was the management of its franchise owners; ColorTyme's franchise owners' (not ColorTyme's), line of business was rent-to-own furniture like RAC.

ColorTyme and RAC do not meet the statutory requirement of centralized management or common executive force.

2.  *Centralized administrative services or functions resulting in economies of scale and functional integration.*

Having concluded that for the tax year at issue, a unitary group must meet each of the three factors and in this case ColorTyme and RAC do not meet the statutory requirement of centralized management or common executive force, the court need not consider the other two factors, centralized administrative services or functions resulting in economies of scale and functional integration.

3.      *Sales factor*

Having concluded that ColorTyme is not part of the RAC unitary group, Defendant's assertion that "ColorTyme's sales properly are included in the numerator of the RAC unitary group's sales factor under ORS 317.715(3)(b)" is moot.  (Def's Post-Trl Br at 28.)

C.      *Nexus*

Defendant alleged that "ColorTyme had nexus with Oregon under the United States Constitution, and its activities were not within the protection of 15 USC § 381 ('PL 86-272')." (*Id*. at 28.)  Defendant supported its conclusion, stating that (1) "ColorTyme was 'doing business' in Oregon under ORS 317.010(4)[;]" (2) "[i]n the alternative, if ColorTyme was not 'doing business' in Oregon under ORS 317.040(4), it still was subject to the tax jurisdiction of Oregon under ORS chapter 318 and properly included in RAC's unitary group[;]" (3) "ColorTyme has nexus under the Due Process Clause[;]" and (4) "ColorTyme has substantial nexus under the Commerce Clause." (*Id*. at 29-38.)  Plaintiffs countered, stating that "[a] review of the six leading U.S. Supreme Court cases governing the unitary business principle confirms that under settled and controlling precedent Oregon may not constitutionally combine Legacy and ColorTyme with the RAC Group[]" and also that "ColorTyme Was Not Doing Business in Oregon." (Ptfs' Opening Br at 27, 37.)

1.      *Doing business*

ORS 317.010(4) defines "doing business" as "any transaction or transactions in the course of its activities conducted within the state by * *  * any [] corporation."

OAR 150-318.020(2)(3) states:

> "A corporation with receipts from royalties or franchise fees or the sale or transfer of tangible personal property pursuant to franchise or license agreements may be subject to the Corporation Excise Tax if the corporation engages in activities that rise to the level of doing business in Oregon.  Such activities include inspection of the franchisees'

businesses or records and providing training in Oregon to franchisees.  Such a corporation is not subject to the Corporation Income Tax."

Plaintiffs noted that OAR 150-318.020(2)(3) was effective as of July 31, 2003, but "did not effectuate any change to the law because it was always the case that if a franchisor was 'doing business' in Oregon, it was subject to the Corporation Excise Tax."  (Ptfs' Opening Br at 38 (citation omitted).)

Defendant concluded that ColorTyme was doing business in Oregon because:

> "It sent two employees, including its CEO, to physically inspect Oregon franchisees' operations and provided on-site training.  It regularly inspected its Oregon franchisees records.  It directed advertising programs for the benefit of its Oregon franchisees.  It licensed the use of its trademarks and [computer] system in return for royalties.  It provided ColorTyme-owned manuals to its Oregon franchisees that the franchisees were required to follow.  ColorTyme's trips to Oregon franchise locations and its other transactions with its Oregon franchisees constitute 'doing business' under ORS 317.010(4)."

(Def's Post-Trl Br at 31-32.)  Defendant's conclusion was based on its interpretation of the following stipulated facts supplemented by its own extrapolation of information contained in exchanged documents, including a pro forma franchise agreement.  The parties stipulated that:

> "ColorTyme's franchisees paid ColorTyme royalties of 2% to 5% of the franchisees' monthly gross revenue, as well as one-time fees for each new franchise location.
>
> "The Department does not contest ColorTyme's assertion that, in 2003, ColorTyme employees visited Oregon for portions of 8 days."
>
> "In 2003, 7 out of 329 ColorTyme franchisees' stores were located in Oregon.

(Jt Part Stip Facts at 6, ¶ 31; 10, ¶ 62-63.)

Plaintiffs disputed Defendant's assertions that ColorTyme "conducted other activities 'that rise to the level of doing business in Oregon[,]' " stating that "the presence of one ColorTyme franchise consultant in Oregon for three days and the presence of ColorTyme's

president in Oregon for one day does not create anything more than a *de minimis* physical connection with Oregon, which does not constitute doing business 'within the state'[.]" Plaintiffs noted that "ColorTyme did not 'inspect' the Oregon franchisees' operations by '[r]eviewing records on Oregon franchisees' computer systems from an office in Texas[]'" and "RAC and ColorTyme's franchisees used completely different versions of High Touch's point of sale software." (Ptfs' Opening Br at 39; Ptfs' Reply Br at 20-21.)

The court agrees with Plaintiffs that the stipulated facts do not support a finding that ColorTyme engaged "in activities that rise to the level of doing business in Oregon." OAR 150-318.020(2)(3). There was no evidence that ColorTyme engaged in transactions other than the receipt of royalties that were not subject to taxation by Oregon in 2003. ColorTyme's activities in Oregon were sporadic and non-recurring. The presence of one consultant visiting seven franchise stores and engaging in undefined training during a three-to-five day period is inconclusive to determine that ColorTyme was doing business in Oregon. There was no evidence that the training was conducted more than once in 2003 and no evidence that it was an annual activity undertaken by ColorTyme. ColorTyme's Chief Operating Officer's one day visit (commonly referred to as a meet-and-greet with no evidence of training) to some or all of the ColorTyme franchisees located in Oregon is not an activity that supports a conclusion that ColorTyme was doing business in Oregon. Defendant alleged that ColorTyme engaged in other activities, including regular inspection of franchisees' records and directed advertising programs. Defendant supported this allegation with reference to the pro forma franchise agreement. (Def's Post-Trl Br at 30-31; *see* Stip Ex 12 at 10.) Plaintiffs' witness testified contrary to the franchise agreement that ColorTyme did not have on-line access to franchisee records. There was no evidence other than the referenced franchise agreement that ColorTyme directed the advertising

program for the franchisees. The court is not persuaded by a pro forma standard franchise agreement absent other evidence and contrary to sworn testimony that ColorTyme engaged in the activities described in OAR 150-318.010(2)(3): "Such activities include inspection of the franchisees' businesses or records and providing training in Oregon to franchisees." The court concludes that ColorTyme was not doing business in Oregon in tax year 2003.

2. *Federal constitution*

"Under ORS 317.018 and the case law of this court, the legislature is considered in ORS 317.070 to have extended the reach of the excise tax to the limit defined by the federal constitution." *Ann Sacks Tile & Stone, Inc., v. Dept. of Rev.*, 20 OTR 377, 380-81 (2011) (citations omitted). The "limit defined by the federal constitution" relates to case law interpreting the Commerce Clause and the Due Process Clause of the United States Constitution.

Looking first to the Commerce Clause:[7]

"[A] state may tax the income of an interstate company only when the tax, in its practical effect, 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' Under the Due Process Clause,[8] a state may tax the income of an interstate enterprise only when there is 'a 'minimal connection' between the interstate activities and the taxing State.' [] [T]he 'substantial nexus' requirement of the Commerce Clause is more stringent than the 'minimal connection' requirement of the Due Process Clause[.]"

---

[7] The Commerce Clause states:

"The Congress shall have Power * * *[]

"* * * * *

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]"

US Const, Art I, § 8, cl 1, 3.

[8] The Due Process Clause of the Fourteenth Amendment states, in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]" US Const, Amend XIV, § 1. Neither party has argued that any statutory issues or issues arising under the Oregon Constitution would be determinative in this case.

*Stonebridge Life Ins. Co. I v. Dept of Rev*. (*Stonebridge*), 18 OTR 423, 426-427 (2006) (citations omitted). "Both clauses have been held to command that 'a state may not, when imposing an income-based tax, tax value earned outside its borders.' Accordingly, 'the Court generally has drawn no distinction between the substantive requirements of the two clauses' but has 'variously and interchangeably' attributed the same requirements to both." *Stonebridge*, 18 OTR at 427 (citations omitted).

        3.      *ColorTyme's connection to Oregon*

There is no dispute that "ColorTyme did not own or rent any real or tangible personal property in Oregon[,] ColorTyme did not maintain an office in Oregon[,] [and] ColorTyme did not have any employees or agents who resided in Oregon." (Ptfs' Opening Br at 21 (citations omitted); Jt Part Stip Facts at 10, ¶ 59-60.) ColorTyme's singular economic connection to Oregon was through its franchisees and the royalties that each paid to ColorTyme. As previously stated, Oregon's administrative rule does not make an entity subject to Oregon corporation income tax if the entity's Oregon-sourced income comes from franchise receipts absent undertaking activities that rise to the level of doing business. Notwithstanding the Oregon Administrative Rule that prevents an income tax from being imposed in this case, Defendant looked to the federal constitution to justify imposing Oregon income tax on ColorTyme. This court concluded that for more than 100 years "the United States Supreme Court has recognized that the federal constitution sets certain limits on the power of states to tax interstate enterprises." *Stonebridge*, 18 OTR at 426. Defendant enacted its own administrative rule limiting its power to tax interstate enterprises like ColorTyme that merely collect franchise receipts without engaging in activities that aggregate to reach the level of doing business in Oregon. Having concluded that because ColorTyme was not doing business in Oregon it is not subject to Oregon income tax

solely through its receipt of franchisee fees, the court need not consider whether the federal constitution sets an applicable limit on Oregon's power to tax ColorTyme.

D.    *Unitary Group - Legacy*

Legacy is a wholly owned subsidiary of RAC.  During 2003, Legacy was a Bermuda entity that elected to be treated as a domestic corporation for federal income tax purposes pursuant to IRC section 953(d).  (Jt Part Stip Facts at 11, ¶ 64-65.)  Legacy insured workers' compensation, automobile liability and general liability insurance for RAC, an affiliated group of corporations.  (Stip Ex 5 at 2; Def's Ex GG at 1-2.)  "Legacy did not do business in Oregon, had no employees or tangible property in Oregon, and was not itself subject to Oregon corporation excise tax during" 2003.  (Jt Part Stip Facts at 11, ¶ 66.)

The parties dispute whether RAC and its operating subsidiaries excluding ColorTyme and Legacy were, under Oregon tax law, "engaged in business activities that constitute a single trade or business."[9]  ORS 317.705(2).  The "sharing or exchange of value" either "directly or indirectly between the members or parts of the enterprise" is demonstrated by:

> "(A) Centralized management or a common executive force;
>
> "(B) Centralized administrative services or functions resulting in economies of scale; and
>
> "(C) Flow of goods, capital resources or services demonstrating functional integration."

ORS 317.705(3)(a).

Plaintiffs do not dispute that Legacy and Plaintiffs were functionally integrated.  (Ptfs' Opening Br at 23-24; Ptfs' Reply Br at 19-20.)  Plaintiffs acknowledged that "Legacy and RAC

---

[9] "Plaintiffs are not taking the position that Legacy should be excluded from RAC's consolidated return under ORS 317.710(1)(5)(b) *at this level*, but nonetheless serve the right to assert this argument on any appeal." (Ptfs' Opening Br at 22, n 15, citing *Costco Wholesale Corp. v. Dept. of Rev.*, 20 OTR 537 (2012), (emphasis in original.).)

shared some officers and directors[.]" (Ptfs' Opening Br at 23.) This resulted in a sharing or exchange of value with no evidence that those individuals were compensated by Legacy for their services.

Plaintiffs alleged that "there is no evidence of any centralized administration that would have created economies of scale," because Legacy "was actually managed by AON Insurance Managers (Bermuda) LTD ('AON'), which provided management, financial, and administrative services in Bermuda pursuant to a management agreement." (Ptfs' Reply Br at 20.) Plaintiffs are limiting the evaluation of economies of scale between Plaintiff Rent-A-Center and its rent-to own subsidiaries and Legacy to those activities undertaken by AON. That limitation overlooks the fact that Legacy was a wholly owned subsidiary of RAC created to provide insurance coverage, including worker's compensation, automobile liability and general liability, for Plaintiffs' business operations (excluding ColorTyme) and no other entities. The centralized administration of insurance in one entity, Legacy, relieved the other members of the enterprise from administering that function. Legacy's contribution to Plaintiffs' operating subsidiaries was sufficient to justify the creation of the entity for the sole purpose of handling the insurance function; it is obvious there must have been a financial benefit for the entire unitary group. The profitability to the entire unitary group from Legacy's contribution to the operation was a substantial exchange of value. Legacy meets the statutory requirements of being a member of Plaintiffs' unitary group.

## III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that ColorTyme was not a member of the RAC unitary group and Legacy was a member of the RAC unitary group for tax year 2003. Now, therefore,

IT IS THE DECISION OF THIS COURT that ColorTyme, Inc. was not unitary with

Rent-A-Center, Inc. for tax year 2003.

IT IS FURTHER DECIDED that Legacy Insurance Co., Ltd. was a member of Plaintiffs'

unitary group for tax year 2003.

Dated this ___ day of May 2014.


_____
JILL A. TANNER
PRESIDING MAGISTRATE


***If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.***

***This document was signed by Presiding Magistrate Jill A. Tanner on May 12, 2014.  The court filed and entered this document on May 12, 2014.***